*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* B. M. BAHAM, Minor.

FOR PUBLICATION
April 2, 2020

No. 349595
Van Buren Circuit Court
Family Division
LC No. 17-018872-NA

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

The lead opinion holds that the circuit court erred by terminating respondent's parental rights based on evidence that did not satisfy the clear and convincing standard, and I agree. But I respectfully disagree that the circuit court properly assumed jurisdiction in the first place. The child at issue, BB, was not "without proper custody" at the time of the adjudication hearing, and that fact should have precluded a jurisdictional finding.

## I. THE ADJUDICATION ERRORS

As the lead opinion explicitly acknowledges, a court may not accept a respondent's plea to jurisdiction "without establishing support for a finding that one or more of the statutory grounds alleged in the petition are true[.]" MCR 3.971(D)(2).[1] "While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *In Re Sanders*, 495 Mich 394, 405-406; 852 NW2d 524 (quotation marks, citation, and brackets omitted). "The adjudication divests the parent of her constitutional right to parent her child and gives the state that authority instead." *In re Ferranti*, 504 Mich 1, 16; 934 NW2d 610 (2019). To avoid unwarranted disruption of a parent-child relationship and to safeguard a parent's rights, close adherence to the adjudicatory rules is required.

The lead opinion holds that the trial court properly assumed jurisdiction under MCL 712A.2(b)(1) because respondent mother is incarcerated and had not provided an "appropriate"

---

[1] At the time respondent's plea was taken, this requirement was codified in MCR 3.971(C)(2).

plan for BB's care. The record firmly refutes that conclusion. Respondent was incarcerated throughout her pregnancy and therefore could not have *personally* placed her newborn with the caregivers she selected. Nevertheless, respondent diligently planned for her newborn's care, and this fact was well-known to the Department of Health and Human Services (DHHS) before the court assumed jurisdiction. Shortly after her birth and weeks before the adjudication hearing, BB was safely placed with respondent's brother and sister-in-law, at respondent's suggestion. In my view, this placement deprived the court of jurisdiction.

Respondent learned of her pregnancy while in prison. With the assistance of the prison's "pregnancy counselor," respondent helped arrange for her brother and his wife to assume custody of the child after her birth. Here is the relevant testimony at the first preliminary hearing, conducted in Washtenaw County four days after BB's birth (and before the newborn's hospital discharge):

> *Q.* Do you want an attorney appointed?
>
> *A.* I don't think I need one if *we got everything figured out*.
>
> *Q.* Okay. I'm not sure what you mean by that but --
>
> *A.* Well, cause my caseworker –
>
> *Q.* All right. Well, I'll hear from you in a moment.
>
> *A.* Okay.
>
> * * *
>
> *Q.* . . . Ms. House [DHHS worker], do you know what she's referring to?
>
> *A.* Yes, your Honor. *[Respondent] would like [BB] to reside with her biological brother. I got his name over here, I'm sorry, and his wife in Van Buren County.*
>
> *Q.* All right. *Well, is that what you were referring to, [respondent], when you said you have everything worked out?*
>
> *A.* Yeah.
>
> *Q.* Okay. That's the placement but what that doesn't address is your rights. . . . [Emphasis added.][2]

---

[2] Respondent referred to the task of "figuring out" the child's placement as a *joint* enterprise: "*we got everything figured out.*" The context, fairly read, makes the point unmistakable: respondent was personally and deeply involved in the placement process.

When the trial court further inquired about BB's placement, the DHHS worker advised, "A 588, a home assessment with relative home assessment was already completed because they knew the baby was coming and that was the home that was speculated as to being able to provide for [BB]."

The preliminary hearing was continued so that the court could appoint counsel for respondent. At the continued hearing on October 2, the prosecutor advised that "the child is placed with a relative, the respondent mother's brother in Van Buren County." BB remains in that placement today.

Given respondent's testimony at the preliminary hearing that she helped establish the placement, it was utterly disingenuous for the DHHS to proceed with a petition asserting that she "abandoned the child[] without proper custody or guardianship." See MCL 712A.2(b)(1). As the DHHS was aware, this contention was untrue.

The lead opinion asserts that jurisdiction was proper under a different clause of MCL 712A.2(b)(1), which refers to a child "who is without proper custody or guardianship." According to the lead opinion, the phrase "without proper custody or guardianship" is "defined" as follows: "Without proper custody or guardianship' does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance." MCL 712A.2(b)(1)(C).

A sentence proclaiming what something does *not* mean hardly qualifies as a "definition." In my view, the statutory language ("without proper custody or guardianship") is plain and unambiguous. If a child has "proper custody" or is in a guardianship, a court may not take jurisdiction. I would read MCL 712A.2(b)(1)(C) as an *additional* caution that MCL 712A.2(b)(1) does not apply when "a" parent has placed the child with a legally responsible person. In other words, MCL 712A.2(b)(1)(C) highlights that a court does not have jurisdiction when a child is being cared for by a legally responsible person, regardless of whether *the respondent* or the other parent arranged for the placement. This interpretation is easily synchronized with the "big picture" meaning of the words "without proper custody or guardianship." A child in "proper custody," even if placed there by a parent other than the respondent, is not subject to the court's jurisdiction.

BB was in "proper custody" before the adjudication because respondent did everything she could to achieve that placement. That she needed help arranging for that "proper custody" due to her incarceration is legally irrelevant. Our Supreme Court explained in *Sanders*, 495 Mich at 420-421:

> An incarcerated parent *can* exercise the constitutional right to direct the care of his or her children while incarcerated, and Laird has tried to do just that. For example, an incarcerated parent can choose who will care for his children while he is imprisoned. *In re Mason*, [486 Mich 142, 161 n 11; 782 NW2d 747 (2010)] ("Michigan traditionally permits a parent to achieve proper care and custody through placement with a relative.").

The DHHS knew that BB was in "proper custody," the prosecutor knew it, respondent knew it, and respondent's attorney knew it, too. The circuit court should have similarly understood

-3-

that BB was not legally subject to the court's jurisdiction, despite the contrived colloquy conducted by respondent's counsel:

> *Q*. All right. And basically the last thing says that you don't really have a -- you do have a plan but you don't really have an appropriate plan for [BB] at this point in time? You have some ideas of what you'd like to do with her?
>
> *A*. Yeah.
>
> *Q*. But you can't really do 'em cause you're in there, correct?
>
> *A*. Yeah.
>
> *Q*. Okay. And you can't again and I've already asked this kind of but you can't provide any supervision, you can't watch her or do anything with her at this time?
>
> *A*. No.

That respondent could not personally provide "supervision" was not determinative or even relevant to the inquiry required under MCL 712A.2(b)(1). The pertinent question was whether respondent had arranged for someone else to do so. That question was never asked.[3] The answer was already in the record: she had. A fair reading of the questions and answers reveals that the questioner (respondent's counsel) understood full well that respondent had a "plan" for the child that would have defeated jurisdiction, and deliberately changed the subject to *present* care and custody.

Despite this inadequate testimony, the court accepted a plea to jurisdiction. To establish jurisdiction, the DHHS had to prove the allegations set forth in the petition by a preponderance of the evidence. MCR 3.972(C)(1) and (E). Alternatively, respondent could admit the allegations, as counsel attempted to accomplish here. MCR 3.971. But a plea of admission does not relieve the court of its responsibility to verify a plea's accuracy. MCR 3.971(D)(2).[4] Nor does a plea excuse a court from considering whether the facts admitted amount to an actual ground for taking jurisdiction. For example, in *Ferranti*, 504 Mich at 30, the Supreme Court held that the circuit court "violated MCR 3.971(C)(2) by failing to establish support for a finding that one or more of the statutory grounds alleged in the petition were true. Therefore, the manner in which the trial court assumed jurisdiction violated the respondent-mother's due process rights." Similarly, in *In re Wangler/Paschke*, 498 Mich 911; 870 NW2d 923 (2015), the Supreme Court held that the circuit court violated MCR 3.971(C)(2) "by failing to establish support for a finding that one or more of the statutory grounds alleged in the petition were true." Here, the plea colloquy was inadequate and inaccurate, and the assumption of jurisdiction therefore erroneous.

---

[3] The transcript is certainly susceptible to a reading that places responsibility for calculated avoidance of the central issue on the shoulders of respondent's counsel. That does not excuse the court or the DHHS from their independent obligations to recognize that this plea was defective.

[4] At the time respondent's plea was taken, this provision was codified in MCR 3.971(C)(2).

The lead opinion holds that because respondent testified that she did not have an "*appropriate*" plan for BB, the court correctly found that the child "was left without proper custody and guardianship." Therefore, the lead opinion continues, there was no plain error in the court's decision. The lead opinion fails to explain, however, why respondent's plan was inappropriate, particularly since the child remains to this day in the placement originally selected by respondent. Lest there be any doubt about the plan and respondent's role in forming it, the issue was revisited at the termination trial:

> *Q*. Did you know that CPS would become involved with [BB]?
>
> *A*. Yeah.
>
> *Q*. Did you talk to an attorney or seek out any information about a guardianship for the baby?
>
> *A*. Yes, I talked to a pregnancy counselor.
>
> *Q*. Okay. What happened with that?
>
> *A*. She set up a plan. *I had three plans* for when the baby was born and she did a home check for them to take the baby.
>
> *Q*. So do you remember what the three options were, what the difference was?
>
> *A*. It was for mom to take her until I came home, and then it was my brother and my sister-in-law, and then there was also a family friend that would have took her until I came home.
>
> *Q*. And was that supposed to be through a guardianship?
>
> *A*. I thought so when I talked to the pregnancy lady, that's what she was trying to work out. [Emphasis added.]

This testimony unmistakably demonstrates that *respondent* made the plan that resulted in placement. The lead opinion dodges this fact by asserting that "there is no evidence that respondent placed her child with any relative before the petition was filed," and "respondent did not implement any of the potential plans prior to the filing of the petition." True, but irrelevant.

First, respondent could not have personally made a placement because she was in prison. Second, *Sanders* instructs that incarcerated parents can "chose who will care for [her] children" while the parent is incarcerated, and that is good enough. The key is the parent's personal investment and involvement in the plan, not the ability to carry it out on her own. And to the extent the lead opinion insinuates that three plans is not "a plan," I respectfully disagree. Good planners make backup, contingency plans. That is exactly what happened here. The record reflects that respondent did whatever she could from prison to see to it that her daughter was placed in a stable and appropriate relative's home.

As in *Ferranti*, the jurisdictional error committed here was plain. The lead opinion asserts that even if plain error occurred, it did not affect respondent's substantial rights because the facts are "ambiguous" regarding whether respondent's brother was "willing and capable of providing for BB's care and custody for the duration of respondent's incarceration." I find no such ambiguity. A caseworker's note dated January 14, 2019 states that BB's "permanency planning goal is reunification with a concurrent planning goal of adoption . . . . [BB]'s placement is a pre-adoptive placement and her relatives state that they are willing to provide permanency *if reunification efforts are unsuccessful*." (Emphasis added.) Respondent's family willingly brought BB to visit respondent in prison, a substantial drive from their homes, on more than one occasion.[5] As in *Ferranti*, 504 Mich at 31, the jurisdictional error seriously affected the fairness, integrity, or public reputation of the proceedings, as it "allowed the state to interfere with and then terminate respondent['s] fundamental right to parent [her] child."

## II. THE TERMINATION HEARING ERRORS

The evidence adduced at the termination hearing was remarkable. Respondent not only adhered perfectly to her case service plan—she excelled. Respondent availed herself of all classes and services available to her, and placed herself on the waiting list for others. Her prison record was clean; she had earned no "tickets." At the recommendation of the LGAL, respondent's family brought BB to visit respondent in the prison on three or four occasions.[6] The circuit court's findings reflect the distance she had traveled:

---

[5] Respondent's family evidently understands the concepts of rehabilitation and forgiveness. The Legislature also recognized that a parent convicted of a crime can grow and change by including in MCL 712A.19b(3)(h) the requirement that the state prove, clearly and convincingly, that "there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." In *Mason*, 486 Mich at 161, our Supreme Court explained that this statutory subsection is "forward-looking," and elucidated:

> Significantly, just as incarceration alone does not constitute grounds for termination, a criminal history alone does not justify termination. Rather, termination solely because of a parent's past violence or crime is justified only under certain enumerated circumstances, including when the parent created an unreasonable risk of serious abuse or death of a child, if the parent was convicted of felony assault resulting in the injury of one of his own children, or if the parent committed murder, attempted murder, or voluntary manslaughter of one of his own children. [*Id*. at 165].

This means that the Legislature, as well as our Supreme Court, have rejected the notion that an incarcerated parent's past is her future, and that evidence of past misconduct suffices to terminate parental rights.

[6] Our partially dissenting colleague asserts that when released from prison "[r]espondent will be a complete stranger to this child who will have been living in a stable environment her whole life." The record refutes that statement.

However, since she's been incarcerated since January of 2018, she's done extremely well. And while in prison, it appears she's a model prisoner. She's been doing everything she could, doing all the classes she can doing parenting classes . . . .

* * *

It sounds like things are going very, very, very well in prison for her and that's a good thing. And what's also telling of the type of family she has is that even she says here today that her goal would be once she's released from prison, that she'd probably return to her father's home. That's where her son is apparently and where this crime occurred that caused her to go to prison. And so her family has apparently forgiven her. She's indicated that her mother, her father, brother or sister brings [BB] up for parenting time with her and that she's apparently mended whatever damage she's done with her family which is a good thing and it really shows what kind of a strong family they have . . . .

* * *

The parent's compliance with [the] case service plan has been great as far as [respondent] has been concerned. . . . [S]ince this child has come into care which was shortly after birth in September of 2018, she has done everything possible that she could. [Respondent] has done every program that she can get her hands on while she's institutionalized. She's been doing the visits that she could. Her parenting visitation with the child, the history of visitation has been extremely good. Any time she can, she's there, and has been showing she's trying to do what she can to better herself and it at all possible to have the child returned to her care. So she's done very well with compliance with the case service plan as well as visitation.

Judges of this Court do not often read comments like these for the simple reason that model respondents retain their parental rights. The reason that respondent lost hers comes down to one fact: her incarceration. As the lead opinion explains, *Mason* teaches that in light of her efforts to arrange for placement of her child, her incarceration—and MCL 712A.19b(3)(h)—did not supply an appropriate ground for termination.

The partial dissent insists that termination was warranted based on respondent's "psychological status" and her previous "treatment plan failures." As to the first, the partial dissent quotes extensively from a psychological report apparently prepared while respondent was incarcerated in the county jail before her criminal case concluded. The report itself is not part of the record. Excerpts from it were read aloud by a DHHS worker at the preliminary hearing. The report has little to contribute in this case, as it was written before the then-18-year-old respondent turned her life around. And because it is not evidence of record, it supplies no legal basis for termination.

More troubling is the partial dissent's reliance on respondent's past as a predictor of her future. This Court has emphasized that the doctrine of anticipatory neglect, on which the partial

-7-

dissent relies, does not suffice to prove a statutory ground for termination. See *In re LaFrance Minors*, 306 Mich App 713; 858 NW2d 143 (2014). In *LaFrance*, we stressed that age and other differences between children decrease the probative value of a negative inference arising from a parent's poor treatment of one child. *Id*. at 730-731. We reiterated the same common-sense principles more recently in *In re Kellogg*, ___ Mich App ___; ___ NW2d ___ (Docket No. 349930, issued January 28, 2020). I would add that the doctrine of anticipatory neglect also fails to take into account that parents can grow and change. That's why the Legislature mandates services in all but the rarest of situations. If our Legislature believed that past is prologue, it would not have wasted the taxpayers' money on helping struggling parents achieve meaningful and lasting change. And to hold that an incarcerated parent who has committed a "horrendous" crime can never be redeemed simply eviscerates *Mason*.

Finally, I believe that the circuit court additionally erred by finding that termination served BB's best interests. First, no evidence was presented that BB's custodians favored or even sought termination of respondent's rights. To the contrary, the evidence depicted a family in which BB would be safe and well cared for even if respondent maintained her parental rights while incarcerated. A guardianship would continue that protection even after respondent's release. Second, *Mason* instructs that "placement with relatives weighs *against* termination under MCL 712A.19a(6)(a)." *Mason*, 486 Mich at 164 (emphasis added). The circuit court applied the opposite presumption: that because BB lived with relatives, respondent's inability to care for the child supported termination of her rights. Had the circuit court properly applied the *Mason* presumption, it would have concluded that termination of respondent's parental rights did not serve BB's best interests.

### III. CONCLUSION

Exercising their powers as rulemakers, the Legislature and our Supreme Court have insisted that a court identify with some particularity the grounds and the evidence for depriving a parent of the care and custody of her child. Those rules mandate specific findings at both the adjudication and dispositional stages that were not made here. The rules help insure the fairness and accuracy of the process. Because it violated a variety of these rules, the circuit court lacked the authority to take jurisdiction and to terminate respondent's parental rights.

Rules are important, but this case also presents a more fundamental problem. A court may not take jurisdiction or terminate an incarcerated parent's rights when the parent has planned for her child's care and custody. Respondent made a plan deemed highly appropriate by the DHHS and the circuit court. Her child is thriving. We are left with this: respondent's rights were terminated because she is incarcerated. As *Mason* and a host of cases from this Court have held, incarceration alone is not an adequate ground for either jurisdiction or termination.

I would vacate *both* the adjudication and termination orders, and on remand would permit the DHHS to file a new petition if and only if a jurisdictional ground actually exists.

/s/ Elizabeth L. Gleicher

-8-